2010 UT 21

Barbara A. MORRA, Michael K. Suarez, John S. Weisheit, Harold Shepherd, Jennifer P. Speers, Tara Collins, William Love, Sarah M. Fields, John C. Dohrenwend, Paul Janos, and Steve Mulligan, Plaintiffs and Appellants,

v.

GRAND COUNTY, Utah, and the Grand County Council, Defendants and Appellees, Cloudrock Land Company, LLC, Defendant–Intervenor and Appellee.

No. 20080566.

Supreme Court of Utah.

March 30, 2010.

J. Craig Smith, Lyle J. Fuller, Nancy J. Delacenserie, R. Christopher Preston, Salt Lake City, for plaintiffs.

W. Scott Barrett, Logan, Happy J. Morgan, Moab, for defendants.

Michael D. Zimmerman, Wade R. Budge, Troy L. Booher, Salt Lake City, for defendant-intervenor.

DURRANT, Associate Chief Justice:

## INTRODUCTION

¶ 1 In this appeal, we consider a challenge by a group of citizens (the "Citizens") to an ordinance passed by the Grand County Council (the "Council"). The ordinance approved an amended development agreement. The district court granted summary judgment in favor of the Council, and the Citizens timely appealed. We are required to determine whether the Citizens have standing to challenge the ordinance and, if so, whether the district court erred in granting summary judgment. We conclude that the Citizens have standing under our traditional test and that the County's failure to provide a record of the administrative proceedings to the district court violated the County Land Use and Development Management Act ("CLUD-MA") and precluded review of the Council's decision. Accordingly, we reverse the district court's grant of summary judgment.

## BACKGROUND

¶ 2 In 2002, over the objections of a number of citizens, the Council approved a 2,000–acre planned unit development located on a mesa above the Glen Canyon Aquifer (the "Cloudrock Development").[1] The aquifer serves as the main source of culinary water for Moab, Utah. The Council's approval of the Cloudrock Development was conditioned upon terms set out in a development agreement executed between the County and the developer.

¶ 3 After failing to dissuade the Council from approving the Cloudrock Development, a group of citizens appealed the Council's approval to the Board of Adjustment, which upheld the Council's decision. From 2002 to 2006, litigation unrelated to the issues in this case stalled work on the Cloudrock Development.

¶ 4 In 2006, Cloudrock Land Company, LLC, succeeded to the rights of the original developer and, in October of that year, presented an Amended Plan and Preliminary Phase 1 Plat (the "Amended Plan") to the Grand County Planning Commission (the "Planning Commission"). The Amended Plan was substantially similar to the original

---

1. The development was originally referred to as "Johnson's Up–on–Top Mesa," but we refer to it throughout this opinion as the "Cloudrock Development," which is the name currently used by the parties in this case.

development master plan, but did reallocate densities and make changes to the development's wilderness lodge use-on-review provisions.[2]

¶ 5 Although the total number of effective residential units ("ERU") remained the same under both plans, the Amended Plan contained fewer actual residential housing units and significantly reduced the number of lodging units, while increasing the number of mesa residential units.[3] Furthermore, under the Amended Plan, the mesa residential units were clustered and pulled away from the rim of the development, in contrast to the original plan, which had placed the mesa residential units in a line along the development's boundary. Finally, the Amended Plan also eliminated the equestrian lodge proposed in the original plan and strengthened the development's urban core by relaxing building height requirements and providing for changes to the accessory facilities to the wilderness lodge.

¶ 6 The Planning Commission conditionally approved the Amended Plan, subject to certain changes being made in the development agreement. The Amended Plan, together with an amended version of the development agreement, was placed before the Council in 2007. The Citizens lobbied the Council in opposition to the Amended Plan. Nevertheless, on May 8, 2007, the Council passed Ordinance 454, which approved both the Amended Plan for the Cloudrock Development and an amended version of the development agreement.

¶ 7 Just as in 2002, the Citizens appealed the Council's decision to the Board of Adjustment. But this time, the Grand County Attorney issued a statement of opinion that the Board lacked jurisdiction over the appeal since the approval of Ordinance 454 was legislative, rather than administrative, in nature. After the issuance of the Grand County Attorney's statement, the Board of Adjustment took no further action on the Citizens' administrative appeal.

¶ 8 At this point, the Citizens turned to the district court, where, as a precautionary measure, they had previously filed an action contesting the Council's decision. The Citizens' complaint named Grand County and the Council as defendants and alleged that the Council's approval of Ordinance 454 was illegal. The Citizens sought declaratory relief deeming Ordinance 454 invalid and the amended development agreement null and void. Additionally, after the Grand County Attorney had issued his opinion that the Board of Adjustment lacked jurisdiction over the Citizens' administrative appeal, the Citizens moved to amend their complaint[4] to include an alternative claim that the district court lacked jurisdiction and a request that the action be remanded back to the Board. Shortly before the Citizens had moved to

---

2. Grand County's zoning regulations have designated certain uses as uses-on-review. A use-on-review is a "use that may or may not be appropriate in a given location" and should be approved subject to conditions that are "designed to reasonably mitigate adverse impacts of the use upon surrounding properties." Grand County, Utah Land Use Code, Art. VI.L.1 (2000). The land on which the development is proposed to be built is zoned "RG." The RG zoning classification provides for a "dude ranch" or "wilderness lodge" as a use-on-review. The original development sought a use-on-review permit for a wilderness lodge that included a number of accessory facilities, including "restaurants, [a] spa, [a] gift shop, [an] equestrian center, [a] creek pavilion, [an] event amphitheater, recreational amenities, and a hiking [and] biking center." The Amended Plan also sought a use-on-review permit for the wilderness lodge, but eliminated the equestrian lodge as an accessory facility and sought to increase the average size of the wilderness lodge units from 600 square feet to 1,000 square feet.

3. The original plan provided for 485 total housing units (225 lodging units, 150 village residential units, and 110 mesa residential units), while the Amended Plan provides for 409 housing units (73 lodging units, 156 village residential units, and 180 mesa residential units). Both plans contain a total of 372.5 ERU.

4. While Cloudrock stipulated that the Citizens could file their proposed amended complaint, the record does not reflect that the amended complaint was ever actually filed. But any such failure is inconsequential to our analysis, since we (1) determine that the Citizens have standing to challenge the Council's decision based on the allegations in the original complaint and (2) do not reach the merits of the Citizens' claims due to the County's failure to transmit the record as required by statute.

amend their complaint, the district court granted Cloudrock's motion to intervene.

¶ 9 The Citizens and Cloudrock filed cross-motions for summary judgment. Grand County and the Council joined in Cloudrock's motion. In their motion, the Citizens, in addition to their other arguments, objected to the fact that Grand County had failed to provide the district court with a record of the proceedings before the Council. The district court heard oral argument on the motions on April 15, 2008, at which time Cloudrock presented a letter certifying that the documents attached to its motion were true and correct copies of the record of the proceedings before the Council. The Citizens objected to Cloudrock's certification, arguing that it was both untimely and incomplete.

¶ 10 The district court ultimately granted Cloudrock's motion for summary judgment, ruling that (1) the district court had jurisdiction over the Citizens' appeal because Ordinance 454 was a legislative act, (2) because Ordinance 454 was a legislative act it was presumptively legal, and (3) the Citizens had failed to carry their burden to prove that Ordinance 454 did not serve a legitimate land use purpose or was otherwise illegal. It also determined that, because Ordinance 454 was a legislative act, a record was not required to review the Council's action.

¶ 11 The Citizens timely appealed the district court's determinations. We have jurisdiction pursuant to Utah Code section 78A–2–102(3)(j) (2008).

## STANDARD OF REVIEW

¶ 12 A district court's grant of summary judgment is a legal ruling that we review without deference.[5] A district court should grant summary judgment only when, viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party,[6] "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."[7]

## ANALYSIS

¶ 13 We begin by determining whether the Citizens have standing to challenge the Council's approval of the Amended Plan and development agreement. Although we find that the Citizens have standing to challenge the Council's decision, we conclude that the County's failure to transmit a record of the proceedings prevents the district court from reviewing both whether Ordinance 454 is a legislative act and whether it was legal under the appropriate standard of review.

## I. THE CITIZENS HAVE STANDING TO CHALLENGE THE COUNCIL'S PASSAGE OF ORDINANCE 454

¶ 14 Cloudrock argues that the Citizens lack standing to challenge the Council's passage of Ordinance 454 under both our traditional and alternative tests. The Citizens claim standing under both tests. Because we conclude that the Citizens have standing under our traditional test, we do not reach the parties' arguments regarding alternative standing.

¶ 15 Challenges to county land use decisions are governed by CLUDMA,[8] which provides rights to both an administrative appeal and then an appeal in the district court to any person adversely affected by a land use authority's [9] decision.[10] We have inter-

---

5. *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600.

6. *Id.*

7. Utah R. Civ. P. 56(c).

8. Utah Code Ann. § 17–27a–101 to –803 (2009). Certain portions of CLUDMA were amended in 2009, but since no substantive changes were made to the provisions relevant to our disposition of this appeal, we cite to the most recent version of the statute in this opinion.

9. CLUDMA defines a "land use authority" as "a person, board, commission, agency, or other body designated by the local legislative body to act upon a land use application." *Id.* § 17–27a–103(26).

10. *Id.* § 17–27a–701(2) ("As a condition precedent to judicial review, *each adversely affected person* shall timely and specifically challenge a land use authority's decision, in accordance with local ordinance." (emphasis added)); *id.* § 17–27a–801(2)(a) ("*Any person adversely affected* by a final decision made in the exercise of or in violation of the provisions of this chapter may file a petition for review of the decision with the

and her efforts to establish a final designation of highways by October 3, 1983.

In response to the FHWA request, Georgia identified 1168 miles of its interstate system and 140 miles of non-interstate, but "qualifying" highway. Georgia declined to designate any additional, non-qualifying roadways for use by the big trucks. On March 31, 1983, without further consultation with Georgia, and without consulting its Georgia division or southeastern regional office, the FHWA in Washington issued a new truck size policy statement with interim designations including 2800 additional miles of non-qualifying Georgia highways which, as stated, Georgia had declined to designate. The interim designation and policy statement were published in the Federal Register on April 5, 1983 and took effect on the following day. 48 Fed.Reg. 14844 (1983).

In the policy statement the FHWA defended its supplemental designation of non-qualifying, non-recommended highways as follows:

> The designated route submissions from many States were quite complete and provided extensive coverage. Other States, however, submitted unrealistically lean designations. In assessing these States' responses we find that many of the less comprehensive designations were attributable to constraints imposed by State legislative or administrative requirements, such as a need for public hearings. Thus, some States were unable to comply with the intent of the February 3 policy statement. Several States have designated unconnected and fragmented highway segments. A designated network that contains such discontinuities or that fails to provide reasonable coverage in addition to the Interstate System would not meet the objectives of the STAA to facilitate the free flow of commerce.

48 Fed.Reg. at 14844.

Finally, the FHWA stated that "[e]xceptions to the interim designated network may be granted by FHWA upon request by the States on a case by case basis where road segments will not safely accommodate the larger vehicles due to structural or geometric limitations." 48 Fed.Reg. at 14845.

The State of Georgia brought this action for injunctive and declaratory relief from implementation of the FHWA designations on the grounds that the Secretary and FHWA exceeded their statutory authority under the DOTAA and STAA and their rulemaking power under the Administrative Procedure Act, 5 U.S.C. §§ 551 et seq. Georgia did not contest the agency's action with respect to the interstate system or qualifying highways, but only as to the supplemental designation of non-qualifying highways which the state itself had declined to recommend. The Court took jurisdiction under 28 U.S.C. §§ 1331 and 1346 and 49 U.S.C. § 1655. On April 7, 1983 the Court stayed enforcement of the designation as to the supplemental, non-qualifying highway only.

## II. DISCUSSION

The new truck size legislation authorized the Secretary to designate qualifying highways by reference to their capability to safely accommodate larger vehicles. There was no explicit or implicit statutory authority for the Secretary or FHWA to designate highways other than "qualifying" highways. In the February 3, 1983 Notice of Policy Statement, the Secretary defined qualifying highways pursuant to the statutory mandate, and reiterated the statutory requirement that the needs of interstate commerce be served "without compromising the safety of the traveling public and the structural integrity of the highway system." The Secretary then expressly stated that the prerogative to designate roads other than qualifying highways would lie with the states due to their familiarity with local structural, traffic and climatic conditions. The Secretary allowed for a narrow exception to the states' prerogatives as to non-qualifying highways "only in those instances where the needs of interstate commerce are being impeded."

■ Having defined and designated qualifying highways, the Secretary was not

free, under either the terms of the statute or the notice of policy statement, to make wholesale designations of other, non-qualifying highways. Moreover, the supplemental designations were made in disregard of Congress' concern that the FHWA investigate their safety, and of the Secretary's policy that the states would have primary, if not sole, responsibility for such designations. FHWA Regional Administrator Leon Larson testified that the interim designations were made without consulting Georgia highway officials and without any inquiry by federal officials into the capacity of the 2800 miles of non-qualifying roadway to safely accommodate the larger trucks.[1] Indeed, the designations were apparently made by computer in Washington, without even the input of the FHWA regional or division offices, those federal offices that would have been most likely to be familiar with the nature of the additional mileage.

Congressional intent in enacting the new legislation undoubtedly was to promote interstate commerce by allowing more goods to travel the nation's highways in larger vehicles. But Congress was also concerned that it be done safely, and the statutory language is quite clear that only safe, "qualified" highways be designed to handle such traffic. To suggest, as did the Secretary at the hearing before the Court, that the interim supplemental designations were justified by the FHWA's power to "intervene" where commerce is being "impeded" would be to allow the administrative exception to swallow the statutory rule.

■ In addition to exceeding statutory authority, the supplemental designations violated notice and comment requirements of the Administrative Procedure Act, 5 U.S.C. § 553. It might be argued that, because the Secretary's February 3 and March 31 pronouncements took the form of general policy statements, they are exempt from notice and comment requirements under 5 U.S.C. § 553(b)(A). Although it is certainly true that the Secretary is entitled to a great deal of flexibility in formulating administrative policy and interpreting enabling legislation, and that the Secretary could amend the policy by, for example, redefining "qualifying" highways, the broad flexibility and exemption from notice and comment given to policy statements may be tolerated only so long as the policy statement does not seek to establish a substantive norm of conduct. The interim designations, however, became effective April 6, 1983, and FHWA Regional Administrator Larson testified that states are expected to comply as of that date. States that fail to comply are subject to injunctive action.

The FHWA has thus gone beyond a general statement of policy and has sought to establish a binding administrative rule without giving the states an opportunity for input. Notwithstanding the "policy statement" label which was attached to the designations, "an agency cannot escape its responsibility to present evidence and reasoning supporting its substantive rules by announcing binding precedent in the form of a general statement of policy." *Pacific Gas & Electric Co. v. FPC,* 506 F.2d 33, 38–39 (D.C.Cir.1974).

■ The Secretary argued that, because this is an interim rule, with final rulemaking proceedings ongoing until October 1983, Plaintiffs should be required to exhaust administrative remedies before taking their challenge to federal court. It is generally true that interim agency actions are not reviewable, 5 U.S.C. § 704, and that parties to administrative proceedings must exhaust their remedies with the agency. The exhaustion doctrine does not, however, bar intervention where agency action exceeds statutory authorization.

Many courts have noted that when an agency acts in defiance of its statutory

---

1. The Court heard testimony and statistical evidence from state officials that tractor-trailers generally pose a significantly greater risk of accidents and fatalities than do other forms of traffic on the state's highways. According to statistics compiled by Georgia highway engineer Hal Rives, the rate of accidents involving tractor-trailers on the supplemental routes designated by FHWA is nearly three times the rate for all vehicles traveling those roads. The rate for fatal accidents is about 15 times greater.

¶ 25 Because we determine that the County's failure to transmit a record prevented review by the district court, we do not reach the merits of the parties' arguments regarding whether Ordinance 454 was legislative in nature and whether the Council erred in approving it. Although we do not conclude that the lack of a record divests the district court of jurisdiction over the Citizens' appeal, we determine that the transmission of a record—when one exists—is a prerequisite to review of any land use decision. We further hold that the County's acknowledged failure to transmit the record to the district court may not be excused based upon a harmless error analysis. Accordingly, we remand to the district court for transmission of the record and resolution of the Citizens' challenge on its merits.

## A. *CLUDMA Requires Transmission of a Record by a Land Use Authority in Every Case Where a Record Is Available*

¶ 26 The Citizens first argue that the district court should have required the County to transmit the record of the proceedings below. The district court found that Ordinance 454 was a legislative decision, which it was required to uphold so long as "it is reasonably debatable that the decision ... promotes the purposes of [CLUDMA]."[18] In light of this finding, the court concluded that it did "not have to review a record to determine whether there is no basis for the [Council's] decision."

¶ 27 The Citizens contend that there is nothing in the plain language of CLUDMA that excepts legislative land use decisions from the general requirement that a record be provided to the reviewing court. CLUDMA states that "[t]he land use authority ... shall transmit to the reviewing court the record of its proceedings."[19] Accordingly, the Citizens assert that in every case where a record exists that may be transmitted, CLUDMA requires its transmission to the reviewing court.

¶ 28 Cloudrock argues that the district court correctly concluded that it did not require a record to review the Council's decision because (1) CLUDMA does not expressly require a record when reviewing a legislative land use decision; (2) a record is not required given the highly deferential standard of review—whether "it is reasonably debatable that the decision ... promotes the purposes of [CLUDMA]"[20]—applicable to legislative land use decisions; and (3) the provision of CLUDMA authorizing a court to "call witnesses and take evidence" when there is no record available[21] shows that the legislature did not contemplate that transmission and review of a record would be required in all cases.

¶ 29 We are persuaded by the Citizens' position. The language of CLUDMA clearly requires that a record "shall" be transmitted to the reviewing court and contains no exceptions.[22] We find unpersuasive Cloudrock's contention to the contrary, which rests on its own conception of the usefulness of a record in reviewing legislative land use decisions and tenuous inferences it draws from related statutory provisions.

¶ 30 Although Cloudrock may be correct that review of a legislative land use decision under the "reasonably debatable" standard may not always require resort to a record, there are times in which a record may be useful even under such a deferential standard. For example, when the plain text of a legislative land use decision is ambiguous as to the decision's effect, the record may be necessary to clarify legislative intent and determine the true nature of the enactment.[23] And the assessment of the actual effect of the decision is certainly a threshold determination that must precede the assessment of whether it is "reasonably debatable" that the decision serves a legitimate land use purpose.

¶ 31 Additionally, a record is clearly helpful with respect to the second ground for

---

18. *Id.*

19. *Id.* § 17–27a–801(7)(a).

20. *Id.* § 17–27a–801(3)(b).

21. *Id.* § 17–27a–801(8)(b).

22. *Id.* § 17–27a–801(7)(a).

23. *See LPI Servs. v. McGee,* 2009 UT 41, ¶ 11, 215 P.3d 135.

invalidating a legislative land use decision—that the decision is "otherwise illegal." [24] A land use decision is illegal when it "violates a law, statute, or ordinance in effect at the time the decision was made." [25] Whether there has been compliance with specific procedural statutory requirements, such as the provision of adequate notice or certain documents, would require a record upon which the district court could base factual determinations.

¶ 32 Finally, the fact that CLUDMA may provide for alternative means of obtaining evidence when a record of a legislative decision is unavailable does not, as Cloudrock suggests, support the conclusion that no record is required for review. The existence of language in Utah Code section 17–27a–801(8)(b) providing that a court may receive evidence or call witnesses in the event that no record exists [26] does not speak to the question of what must be done when a record *does* exist. It is section 17–27a–801(7) that speaks to this question, which states only that "[t]he land use authority, or appeal authority, as the case may be, *shall transmit to the reviewing court the record of its proceedings,* including its minutes, findings, orders and, if available, a true and correct transcript of its proceedings." [27] When statutory language is clear, there is no need for us to look further to determine legislative intent.[28] We find the statute's plain language to be conclusive on this point and hold that CLUDMA requires transmission of a record to the reviewing court in all cases—legislative or administrative—where a record exists.

¶ 33 Cloudrock acknowledges that the County did not transmit a record of the proceedings before the Council to the district court. In proceeding to the merits of the Citizens' challenge without a transmitted record, the district court erred. We now consider Cloudrock's argument that the district court's error does not justify reversing its grant of summary judgment.

## B. A County's Refusal to Transmit the Record Is Reversible Error

¶ 34 Cloudrock argues that, even if the district court erred by reaching the merits of the Citizens' claims without a transmitted record, the Citizens are not entitled to relief on this ground because they have failed to establish that there is a "reasonable likelihood" that the district court's decision would have been different had a record been transmitted by the County. Cloudrock is correct in noting that, under CLUDMA, land use decisions are presumed valid,[29] and the party challenging the decision bears "the burden of proving that the land use authority erred." [30] We have also stated in the past that the mere fact that a land use decision violates a provision of CLUDMA does not justify reversing the decision unless the violation was prejudicial.[31] And finally, we have repeatedly declined, in the nonadministrative appellate context, to presume prejudice or reversible error based on the absence of a complete record.[32] Instead, when a record is so incomplete that it renders effective review of a lower court's action impossible, we have simply declined to disturb the status quo.[33]

24. Utah Code Ann. § 17–27a–801(3)(b).

25. *Id.* § 17–27a–801(3)(d).

26. *Id.* § 17–27a–801(8)(b).

27. *Id.* § 17–27a–801(7)(a) (emphasis added).

28. *Stephens v. Bonneville Travel, Inc.,* 935 P.2d 518, 520, 522 (Utah 1997).

29. Utah Code Ann. § 17–27a–801(3)(a) ("The courts shall: (i) presume that a decision, ordinance, or regulation made under the authority of this chapter is valid. . . .").

30. *Id.* § 17–27a–705.

31. *See Springville Citizens for a Better Cmty. v. City of Springville,* 1999 UT 25, ¶ 31, 979 P.2d 332.

32. *See, e.g., Emig v. Hayward,* 703 P.2d 1043, 1048–49 (Utah 1985) (requiring a plaintiff seeking relief based on allegations that a record was erroneously constructed to show both a defect in the record and resulting prejudice); *State v. Menzies,* 845 P.2d 220, 228 (Utah 1992) (holding that "the mere existence of [record transcription] errors does not mandate a new trial" and that the "clear weight of authority requires a showing of prejudice").

33. *See Whetton v. Turner,* 28 Utah 2d 47, 497 P.2d 856, 858 (1972) (stating that, where no record is available to review an appellant's

¶ 35 But a district court's review of a county land use decision presents a different case. First, the legislature has specifically placed the burden of transmitting a record on the County.[34] Second, the record of a land use decision is in the custody of the opposing party—the land use authority, who is also the appellee. And third, CLUDMA's provisions expressly limit the reviewing court to considering evidence in the record when reviewing the challenged decision.[35] Taken together, these three realities evidence a legislative intent that review of a land use decision will involve a record and that the party challenging the decision will not bear the burden of obtaining and presenting that record to the court.

¶ 36 We would fail in our duty to give effect to this legislative directive if we found that a land use authority's duty to provide a record of proceedings to the reviewing court could only be enforced upon a showing of prejudice by the appealing party. A party required to prove prejudice as a prerequisite for relief bears the burden of showing that an error was so substantial that there is a reasonable likelihood that, absent the error, the result would have been differ-

ent.[36] When the alleged error is the failure to transmit a complete record, or, as in this case, the failure to transmit any record at all, the party can only show prejudice by obtaining and presenting the absent record to the court. This is directly contrary to the legislature's express instruction on how this burden is to be allocated in appeals of land use decisions.

¶ 37 Accordingly, we hold that the statutory provision requiring a land use authority to transmit a record of proceedings below to the reviewing court may be enforced simply upon a showing that the complete record has not been transmitted. And if a land use authority refuses to provide a complete record after a court's express direction to do so, the reviewing court should grant appropriate relief to the appealing party. In an extreme case, such relief may include ruling in favor of the appealing party on the merits of its claims.[37]

¶ 38 In this case, it is undisputed that the County did not transmit a record of the proceedings before it to the district court.[38] We remand this case back to the

claims, we assume that the proceedings below "have been carried on in conformity with the law").

34. Utah Code Ann. § 17–27a–801(7)(a).

35. *Id.* § 17–27a–801(8)(a)(i) ("If there is a record, the district court's review is limited to the record provided by the land use authority or appeal authority, as the case may be.").

36. *See Redevelopment Agency v. Mitsui Inv. Inc.,* 522 P.2d 1370, 1374 (Utah 1974).

37. We emphasize that this is an extreme measure that is only to be employed when the land use authority utterly refuses the reviewing court's express request to transmit a record. Such a ruling is not an implicit determination of error below; it is more akin to sanctions contemplated in the default judgment and discovery contexts. *See, e.g.,* Utah R. Civ. P. 37(b)(2)(C), 55. It is imposed based on one party's refusal to comply with the requirements upon which effective judicial review is predicated. Before a reviewing court imposes such a sanction, the land use authority must be (1) instructed by the court to produce the complete record and (2) allowed an opportunity to either produce the record (or missing portions thereof) or certify that it does not exist. We anticipate that such a sanction will rarely be imposed. Indeed, the question

only appears to be before us in this case by virtue of the district court's acceptance of Cloudrock's contention that transmission of a record is not required at all when reviewing a legislative land use decision. But the possibility of such a sanction is necessary to give effect to the legislature's allocation of burdens.

38. Cloudrock does not dispute that the County failed to transmit a record to the district court. Nevertheless, because the County did submit a letter certifying to the district court that certain exhibits attached as exhibits to various pleadings submitted by both parties were "true and correct copies of Grand County's original record," Cloudrock contends that the County satisfied its statutory obligation. We are skeptical that a land use authority's certification of documents provided by other parties can substitute for its obligation to transmit the record. Regardless, Cloudrock's certification is insufficient in this case since it appears to be incomplete, as the Citizens have identified thirty-two separate documents that were not included in the County's certification. Cloudrock does not dispute that the thirty-two documents identified by the Citizens comprise part of the record but argues only that the Citizens' identification is untimely and immaterial. In light of our holding that CLUDMA requires the County to transmit the entire record to the reviewing court in every case,

district court with the instruction that the County be ordered to transmit the record of proceedings to the district court, which will then proceed to the merits of the Citizens' claims in light of the transmitted record.

## CONCLUSION

¶ 39 We find that the Citizens have standing to challenge the Council's decision because they have alleged personal, particularized injuries resulting from the Council's approval of Ordinance 454. We do not reach the merits of the Citizens' claims of error, however, because we conclude that the district court should have required the County to transmit a record of the Council's proceedings before addressing the Citizens' claims. We remand this case to the district court with the instruction to order the County to transmit the complete record and resolve the Citizens' challenge on its merits.

¶ 40 Chief Justice DURHAM, Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Associate Chief Justice DURRANT's opinion.

Cloudrock's timeliness and materiality arguments are irrelevant.