2020 UT App 12

# THE UTAH COURT OF APPEALS

LUCY WALLINGFORD, KILEY MILLER, JOHN RZECZYCKI, CAROL
MAYER, DAVID BODNER, MEECHE BODNER, SARAH STOCK,
JOSEPHINE KOVASH, AND LIVING RIVERS,
Appellants,
*v.*
MOAB CITY AND MOAB CITY COUNCIL,
Appellees,

UTAH SCHOOL AND INSTITUTIONAL TRUST LANDS ADMINISTRATION
AND LB MOAB LAND COMPANY LLC,
Intervenors and Appellees.

Opinion
No. 20180524-CA
Filed January 24, 2020

Seventh District Court, Moab Department
The Honorable Lyle R. Anderson
No. 170700009

Daniel J. McDonald and Kyle C. Fielding, Attorneys
for Appellants

Christopher G. McAnany, Attorney for Appellees
Moab City and Moab City Council

Jody K. Burnett and Robert C. Keller, Attorneys for
Appellees Utah School and Institutional Trust Lands
Administration and LB Moab Land Company LLC

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and KATE APPLEBY
concurred.

HARRIS, Judge:

¶1    For several years, LB Moab Land Company LLC (Developer), a real estate development firm, has been planning a large mixed-use development project known as Lionsback Resort (the Project) on land located just east of Moab, Utah and owned by the Utah School and Institutional Trust Lands Administration (SITLA). The original iteration of the Project, including a resort hotel and numerous condominiums, was approved by the relevant land use authorities more than a decade ago, and a challenge to the propriety of those approvals has already been rejected by this court. *See generally Moab Local Green Party v. Moab City*, 2012 UT App 113, 276 P.3d 1230.

¶2    More recently, however, Developer has proposed certain modifications to the Project's site plan, but those modifications are publicly opposed by a group of local citizens[1] (Citizens). Aware of Citizens' opposition, and also aware that Developer had threatened litigation if the newly-modified Project was not approved, the City of Moab (the City) entered into a contract with SITLA and Developer, pursuant to which the City agreed to deem the proposed modifications "minor" rather than "major," a classification which, under applicable municipal ordinances, allows the proposed modifications to be approved without a public hearing. Shortly thereafter, the Moab City Council (the Council) adopted a resolution—without holding a public hearing—authorizing the City's mayor to execute the contract.

¶3    Citizens then sued the City, seeking (among other things) an order enjoining the Project from proceeding until a public hearing was held on the proposed modifications. The district

---

1. The complaining citizens are Lucy Wallingford, Kiley Miller, John Rzeczycki, Carol Mayer, David Bodner, Meeche Bodner, Sarah Stock, Josephine Kovash, and Living Rivers.

court dismissed Citizens' lawsuit on summary judgment, and Citizens appeal. We reverse, concluding that municipalities may not contract around public hearing requirements found in statute or ordinance.

BACKGROUND[2]

¶4 SITLA owns roughly 175 acres of land (the Property) just east of Moab, Utah, near the trailhead for the popular Slick Rock Trail. In 2006, SITLA agreed to lease the Property to Developer for the purpose of pursuing a "mixed use residential, commercial, and hotel development" to be known as Lionsback Resort, "named for a prominent nearby geological feature." *Moab Local Green Party v. Moab City*, 2012 UT App 113, ¶ 2, 276 P.3d 1230.

¶5 A couple of years later, in October 2008, the City and Developer, joined by SITLA, entered into a "Pre-Annexation Agreement" to facilitate annexation of the Property—which at that time was located in unincorporated Grand County—into the City. Under this agreement, Developer agreed to submit a petition seeking annexation of the Property, and the City agreed to consider that petition "in compliance with the [a]pplicable [l]aws." The parties also agreed that "[t]he Project will be subject to" the City's municipal code. In December 2008, the City passed an ordinance annexing the Property into the City. However, the Pre-Annexation Agreement contained a provision stating that, "in the event the City does not approve" the Project, Developer

---

2. "When reviewing a district court's grant or denial of a motion for summary judgment, we view the facts in a light most favorable to the party opposing the motion." *Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶ 31, 116 P.3d 323 (quotation simplified). The facts set forth here are recited with this standard in mind.

"shall have the option to terminate this Agreement" and "the City shall have no further right to annex the Property," and that if annexation had already occurred, "then upon request of [Developer] the City shall immediately commence proceedings to disconnect the Property from the City."

¶6    Over the next year, the Project proceeded through the City's land use approval process, and in 2009 the City finalized all necessary approvals for the Project, and authorized Developer to begin construction. As originally approved, the Project consisted of a nine-building, fifty-unit hotel—complete with a café, convention meeting rooms, a health club, and a 105-stall parking lot—as well as 188 single-family housing lots. During the City's land use approval process, certain Moab area citizens[3] voiced opposition to the Project, and had the opportunity to be heard at public hearings. *See id.* ¶¶ 3–4 (describing "public hearing[s]" held before both the City's planning commission and the Council). But the City approved the Project notwithstanding their opposition. *Id.* Some of the citizens who were opposed to the Project filed a lawsuit to challenge the City's approval of it; their suit was unsuccessful at the district court level, and this court affirmed the district court's dismissal of the lawsuit. *See generally id.*

¶7    The litigation (as well as changing economic conditions) delayed the Project for several years, and in the interim, Developer determined, based on updated market analysis, that modifications to the Project's master plan would be beneficial. Among other things, Developer wanted to consolidate the hotel portion of the Project into one three-story building (instead of nine separate two-story buildings), and wanted to design the

---

3. The citizens who brought the challenge to the first iteration of the Project are—with one exception—different than the Citizens who bring the current challenge to the Project's second iteration.

hotel units as "three bedroom condominiums with 'lockout' doors allowing individual bedrooms that could be rented separately," creating a potential for 150 rentable rooms in the fifty units. Although the Project's overall footprint would remain unchanged, the hotel's footprint would nearly double, as would the size of its parking lot. In addition, the consolidated hotel would have certain new amenities, including retail space, a restaurant, and a conference center.

¶8 According to the City's municipal code, project amendments "that change the character, basic design, building density and intensity, open space or any other requirements and conditions" will be considered "major changes" that "shall not be permitted without prior review and approval by the planning commission," a process that requires a "[p]ublic [h]earing." *See* Moab, Utah, Mun. Code §§ 17.65.080(A), 17.65.130(B) (2015). On the other hand, "[m]inor changes" necessitated by "unforeseen circumstances, such as engineering requirements," "may be authorized by Moab City planning department staff" without a public hearing. *Id.* § 17.65.130(A). "When in question, the Moab City planning staff may determine whether the changes shall be classified as minor or major, or may refer the question" to the City's planning commission. *Id.*

¶9 In 2013, when Developer first proposed its desired modifications, then-current City staff indicated, at least preliminarily, that the modifications would be considered "minor" and would not require a public hearing. Later, however, after some City staff turnover, the City's attorney—who is counsel of record for the City in this case—informed Developer in a letter that, in the City's view, its proposed modifications, including the "larger hotel concept," were "major changes," stating as follows:

> Given the scope of the changes . . . , it is my conclusion that this project should be processed as

a "major change" under [the municipal code]. Under [the] proposal, [Developer] would be substantially changing the configuration, building types, phasing, and total square footage of the structures. These are not minor changes due, for example, to site constrain[t]s.

As you know, under Utah law municipalities are bound to adhere to their own land use ordinances. Although a minor change might appear to be expedient, in my opinion that would run contrary to the Moab ordinance. Similarly, attempting to process this application as a minor change would likely invite a legal challenge by other interested persons. Given the past litigation history as to this project, the parties should use care to follow the review processes to the letter.

¶10  In response to the City's new position, SITLA informed the City that, if the proposed changes were not processed as minor changes, it would "exercise [its] right to pull the project from city jurisdiction," a right it believed it had pursuant to both Utah statutory law[4] as well as the terms of the Pre-Annexation

---

4. SITLA's statutory argument is grounded in a Utah statute stating that, "[u]nless otherwise provided by law," a municipality does not have "jurisdiction over property owned by the state." Utah Code Ann. § 10-9a-304(1) (LexisNexis 2015). Citizens argue that Utah law, in this instance, provides "otherwise," pointing to the next statutory subsection, which states that, when a "specified public agency"—a term that is statutorily defined to include SITLA, *see id.* § 10-9a-103(60)— seeks to "develop its land," that agency "shall submit to the land use authority a development plan and schedule" that will allow the municipality to assess the agency's "compliance with

(continued…)

Agreement. The City did not necessarily agree with SITLA's position, but in an effort to avoid litigation over the meaning of the Pre-Annexation Agreement and Utah statutory law, the City entered into negotiations with SITLA and Developer about how to resolve their disagreement.

¶11 The result of those negotiations was a document captioned "Zoning Status Agreement" (ZSA), which was eventually executed in March 2017 by the City, Developer, and SITLA. Under the ZSA, Developer agreed to take responsibility for certain Project-related items that had previously been tasked to the City, including traffic studies and sewer infrastructure. SITLA expressly agreed, for the purposes of the Project, to "consent[] to the City's exercise of its local planning and zoning jurisdiction." Most notably for present purposes, the City in return agreed to "deem[]" Developer's proposed Project modifications "[m]inor" changes, "which will be reviewed and acted upon by the Moab City planning department staff" and "which would not require a public hearing."

¶12 The ZSA was first presented to the Council at a meeting in December 2016, and re-considered at two additional meetings in February 2017, before finally being approved, by a 3–2 vote, at a fourth meeting in late February 2017. Immediately after the vote, however, one of the Council members who had voted "yes" stated that she wanted "to change [her] vote to no" because she had "too many unanswered questions" about the

_____

(…continued)

applicable land use ordinances," *id.* § 10-9a-305(8)(a). We do not resolve this statutory interpretation dispute here; we note only that the parties had (and still have) a disagreement about whether Utah statutory law allows SITLA to avoid municipal land use regulation when it seeks to develop its property.

Project. After some discussion, she was not allowed to change her vote, and the Council's approval of the ZSA stood.

¶13 Utah law distinguishes between a public hearing and a public meeting. A "public hearing" is "a hearing at which members of the public are provided a reasonable opportunity to comment on the subject of the hearing," Utah Code Ann. § 10-9a-103(41) (LexisNexis 2015), while a "public meeting" is "a meeting that is required to be open to the public" under Utah's Open and Public Meetings Act, but at which public comment is not necessarily allowed, *id.* § 10-9a-103(42). All four meetings at which the Council considered the ZSA were open to the public, and therefore qualified as public meetings. However, none were designated as public hearings, and all parties in this case agree that none qualified as public hearings under Utah law.

¶14 Just a few weeks after the ZSA was executed, Citizens filed the instant lawsuit challenging the City's decision to enact the ZSA without a public hearing.[5] Among other forms of requested relief, Citizens asked the district court for an order enjoining the Project from proceeding until a public hearing was held on the proposed modifications. Citizens named only the City and the Council as defendants, but SITLA and Developer moved to intervene, and the court granted their request. Soon thereafter, SITLA and Developer filed a motion for summary judgment, eventually joined by the City, asserting that the City possessed the power to enter into agreements to resolve disputes, and that the ZSA was a lawful contract entered into to

---

5. Citizens also filed an administrative appeal with the Moab City Appeal Authority, but the City dismissed that appeal for lack of jurisdiction, concluding that the City's decision to enact the ZSA was a legislative decision, rather than an administrative decision, and therefore not subject to administrative review. *See* Moab, Utah, Mun. Code § 17.72.150(B)(1), (A)(1) (2015).

resolve potential litigation. At oral argument on the motion, Citizens' counsel summarized the issue as "whether or not through a settlement agreement can the City circumvent their mandatory zoning ordinances requiring a public hearing for a major change."

¶15 At the conclusion of the argument, the court granted the motion for summary judgment, concluding that the City had "flexibility" to resolve issues through negotiated settlement agreements, and that a court should not second-guess such agreements absent evidence of "collusion," which the court believed was not present in this case. The court then entered a written order dismissing Citizens' lawsuit.

ISSUE AND STANDARD OF REVIEW

¶16 Citizens now appeal from the district court's order of dismissal, and contend that the court erred in concluding that the City could, by entering into a negotiated settlement agreement with a developer, circumvent public hearing requirements. We review a district court's grant of summary judgment for correctness, giving no deference to the court's decision below. *Bahr v. Imus*, 2011 UT 19, ¶ 15, 250 P.3d 56. Summary judgment is appropriate "only when, viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Morra v. Grand County*, 2010 UT 21, ¶ 12, 230 P.3d 1022 (quotation simplified); *see also* Utah R. Civ. P. 56(a).

ANALYSIS

¶17 This case requires us to examine the scope of municipal power to enter into contracts in the land use context. The City, in

an argument joined by SITLA and Developer, asserts that it has virtually unbounded power to enter into contracts, even in the land use context. Citizens acknowledge that the City, like all Utah municipalities, has broad power to contract, but Citizens maintain that this power, at least in the land use context, has limits, and may only be exercised in accordance with state and local land use statutes and ordinances. Specifically, Citizens assert that a Utah municipality may not circumvent public hearing requirements through exercise of its power to contract. For the reasons explained herein, we agree with Citizens.

¶18 There is no question that Utah municipalities enjoy broad powers, both general and specific. Our legislature has granted municipal legislative bodies the power to provide for the general welfare of their citizens, including the power to

> pass all ordinances and rules, and make all regulations, not repugnant to law, necessary for carrying into effect or discharging all powers and duties conferred by this chapter, and as are necessary and proper to provide for the safety and preserve the health, and promote the prosperity, improve the morals, peace and good order, comfort, and convenience of the city and its inhabitants, and for the protection of property in the city.

Utah Code Ann. § 10-8-84(1) (LexisNexis 2015). And specifically, as relevant here, our legislature has granted municipalities power to "sue and be sued" and to "enter into contracts," *see id.* § 10-1-202; *see also Utah County v. Ivie*, 2006 UT 33, ¶ 10, 137 P.3d 797 (discussing the "general contracting powers" of Utah municipalities), and to "enact all ordinances, resolutions, and rules and . . . enter into other forms of land use controls and development agreements that they consider necessary or appropriate for the use and development of land within the

municipality," Utah Code Ann. § 10-9a-102(2) (LexisNexis 2015).[6]

¶19    But these powers are not limitless. The grants of power to municipalities make clear that cities may not take action that is "repugnant to law," *id.* § 10-8-84(1), or that is "expressly prohibited by law," *id.* § 10-9a-102(2). Further, our supreme court has made clear that "[s]pecific grants of authority may serve to limit the means available under the general welfare clause, for some limitation may be imposed on the exercise of power by directing the use of power in a particular manner." *State v. Hutchinson*, 624 P.2d 1116, 1126 (Utah 1980); *see also Call v. City of West Jordan*, 727 P.2d 180, 181 (Utah 1986) (holding that, by enacting specific land use statutes, "the legislature has set forth specific procedures that a municipality must follow to exercise the powers granted to it"). Thus, while municipalities have broad general welfare powers, those powers are cabined by provisions of more specific statutes and ordinances that may apply in a particular context.

¶20    One type of requirement that appears in statutes and ordinances, as applicable in certain contexts, is the requirement

---

6. This particular provision (along with various other provisions in Utah's Municipal Land Use, Development, and Management Act, some of which we refer to herein) was amended in both 2018 and 2019. In this opinion, however, we refer to and apply the statutory provisions in effect at the time the ZSA was enacted in February 2017. *See Harvey v. Cedar Hills City*, 2010 UT 12, ¶ 12, 227 P.3d 256 ("As a general rule, when adjudicating a dispute we apply the version of the statute that was in effect at the time of the events giving rise to the suit." (quotation simplified)). No party urges us to apply a more recent version of the Utah Code, and no party argues that application of one version over another would lead to a different outcome in this case.

that municipalities conduct some of their business in public, so that the citizens of the municipality may know how the public's business is being conducted. *See, e.g.*, *Hutchinson*, 624 P.2d at 1121 (stating that "[t]he ultimate limitation upon potential abuses by local governments is the people themselves," whose "vigilance and sound judgment" restricts and directs "all democratic governments"). For instance, driven by a conviction that all political subdivisions within our state should "take their actions openly" and "conduct their deliberations openly," *see* Utah Code Ann. § 52-4-102(2), our legislature has enacted the Open and Public Meetings Act, mandating that most meetings of municipal legislative bodies be "open to the public," *id.* § 52-4-201(1). Moreover, as applicable to this case, Utah's Municipal Land Use, Development, and Management Act (LUDMA) contains provisions requiring that the "adoption" or "modification" of any municipal "land use ordinance[s]" be subject to a duly-noticed "public hearing."[7] *See id.* § 10-9a-205(1); *see also id.* § 10-9a-502(1)(b) (stating that a planning commission "shall . . . hold a public hearing on a proposed land use ordinance"). And the Moab Municipal Code, as discussed already, requires that any "major changes" to previously approved development projects "shall not be permitted without prior review and approval by the planning commission," a process that requires a "[p]ublic [h]earing." *See* Moab, Utah, Mun. Code §§ 17.65.080(A), 17.65.130(B) (2015).

---

7. As noted above, a "public hearing" has been statutorily defined as "a hearing at which members of the public are provided a reasonable opportunity to comment on the subject of the hearing," Utah Code Ann. § 10-9a-103(41), as distinguished from a "public meeting," which is required to be "open to the public" but at which the public may not have an opportunity to comment, *see id.* § 10-9a-103(42).

¶21 In this case, the City determined in 2016, after reviewing the nature and scope of the changes proposed by Developer to the Project, that the modifications constituted major changes, and that therefore a public hearing before the City's planning commission would be required. SITLA took issue with the City's determination, and threatened to "pull the project from city jurisdiction if this issue can't be addressed." In an effort to resolve the situation short of a lawsuit, the parties agreed to enter into the ZSA, under which the City won certain concessions from SITLA and Developer, but in exchange agreed to treat the proposed modifications as minor changes that "would not require a public hearing."

¶22 The practice of contracting around municipal zoning requirements is known as "contract zoning." *See* 1 Am. Law Zoning § 9.21 (5th ed. 2008) (stating that "contract zoning is present where a local government contracts away its zoning power or obligates itself by advance contract to provide a particular zoning for the benefit of a private landowner" (quotation simplified)); *see also Dacy v. Village of Ruidoso*, 845 P.2d 793, 796 (N.M. 1992) (stating that the term "'[c]ontract zoning,' properly used, describes an agreement between a municipality and another party in which the municipality's consideration consists of either a promise to zone property in a requested manner or the actual act of zoning the property in that manner"). Some jurisdictions have a statute that specifically permits contract zoning in certain circumstances. *See* 112 Am. Jur. 3d *Proof of Facts* § 13 (2010) (stating that thirteen states, not including Utah, "provide statutory authorization for municipalities and developers to enter into contractual zoning arrangements"). But "in jurisdictions that do not have a statute specifically permitting contract zoning, this practice has been found illegal by numerous state courts." *Id.* § 11; *see also Ford Leasing Dev. Co. v. Board of County Comm'rs*, 528 P.2d 237, 240 (Colo. 1974) (stating that contract zoning is "a concept held

illegal in most states as an [u]ltra vires bargaining away of the police power"); *Ada County v. Walter*, 533 P.2d 1199, 1201 (Idaho 1975) (stating that county commissioners "do not have the authority to enter into an agreement which would constitute a change in the zoning"); *Warner Co. v. Sutton*, 644 A.2d 656, 659 (N.J. Super. Ct. App. Div. 1994) ("A municipality has no power to circumvent these substantive powers and procedural safeguards by contract with a private property owner."); *Dacy*, 845 P.2d at 797 ("We agree that in most situations contract zoning is illegal."); 83 Am. Jur. 2d *Zoning and Planning* § 38 ("Absent valid legislative authorization, contract zoning is impermissible.").

¶23   Courts generally offer two related reasons why contract zoning is unlawful. First, because a municipality's adoption of land use rules and restrictions is an exercise of its police power, it must exercise that police power for the general welfare of all of its citizens and not by contract with any particular landowner. *See Warner Co.*, 644 A.2d at 659 (stating that "zoning is inherently an exercise of the State's police power," and that a "municipality's exercise of its police power to serve the common good and general welfare of all its citizens may not be surrendered or curtailed by bargain or its exercise controlled by the considerations which enter into the law of contracts" (quotation simplified)); *see also* 8 McQuillin Mun. Corp. § 25:104 (3d ed. 2019) ("Courts generally disfavor contracts in which a zoning authority promises to rezone property in a particular manner because such a contract represents a bargaining away of the police power.").

¶24   Second, and relatedly, "the legislative power to enact and amend zoning regulations requires due process, notice, and hearings," and "by binding itself to enact the requested ordinance . . . the municipality bypasses the hearing phase of the legislative process." *Chung v. Sarasota County*, 686 So. 2d 1358, 1359–60 (Fla. Dist. Ct. App. 1996) (quotation simplified); *Dacy*,

845 P.2d at 797 ("By making a promise to zone before a zoning hearing occurs, a municipality denigrates the statutory process because it purports to commit itself to certain action before listening to the public's comments on that action."); 8 McQuillin Mun. Corp. § 25:104 (3d ed. 2019) ("Another reason to disfavor [contract zoning] is that a promise to rezone evades the statutory procedures designed to insure a fair hearing for all concerned parties."). "Implicit in these holdings is not only the courts' concern with the municipality's surrender of its legislative function, but also the effect such consent judgments have on the public's right to be heard." *Warner Co.*, 644 A.2d at 660. "The obvious danger in settling [potential] litigation [through contract zoning] . . . is that it at least appears that the municipality, presumably protecting the public at large, may be bargaining away its legislative duties without public scrutiny or political accountability." *Id.*

¶25    We find the reasoning of these cases persuasive, and conclude that the City, by adopting the ZSA without a public hearing, committed an unlawful act of contract zoning. Because the City had already determined, pursuant to its own internal review, that Developer's proposed modifications were major changes under the Moab Municipal Code, those modifications could not be approved without a public hearing. *See* Moab, Utah, Mun. Code §§ 17.65.080(A), 17.65.130(B) (2015). By passing a resolution—without a public hearing—adopting a contract that altered the public hearing requirements set forth in city ordinances, the City violated not only LUDMA but also its own municipal code. We view the City's actions in this case as particularly violative of contract zoning principles, because the provisions that were circumvented were not ordinary restrictions on, say, building height or the use of a particular parcel, but were the public hearing requirements themselves.

¶26    While a municipality's power to enter into contracts is broad, a municipality may not—as the City did here—contract

around public hearing requirements found in statute or municipal ordinance. Under its interpretation of its own ordinances, the City had already determined that Developer's modifications were major changes that warranted a public hearing. It could, of course, have changed its mind on that point by issuing a reversal of its decision, but it never did. If it had made such a decision in isolation—a decision the parties all agree would have been an "administrative" decision—that decision would have been administratively appealable to the municipal appeal authority. *See* Utah Code Ann. § 10-9a-302(5)(b)(ii) (LexisNexis 2015). But instead of formally reversing its decision, the City simply agreed to "deem[]" the changes "[m]inor" as part of the ZSA, and included that provision in a larger, wider-ranging agreement that invoked broader questions of municipal policy; indeed, both Citizens and the City now agree that adoption of the ZSA was a "legislative" act rather than an "administrative" one.[8] By cloaking the issue within a

---

8. Before the district court, Citizens' first cause of action was for mandamus, asking the district court to order the City to facilitate an administrative appeal of the "major change/minor change" issue. In this vein, their chief argument in opposition to SITLA's summary judgment motion was that the district court lacked jurisdiction to grant the motion, because the matter should have been handled administratively. In making this argument, Citizens characterized the challenged municipal decision as "administrative," and did not ever characterize it as "legislative," and did not specifically cite LUDMA's provisions that require a public hearing before a legislative enactment. Given the posture of Citizens' arguments below, the City now contends that Citizens did not preserve any argument that enactment of the ZSA was a legislative act, and did not preserve any argument that LUDMA (as opposed to the Moab Municipal Code) required a public hearing before the ZSA could be

(continued…)

broader legislative act, the City rendered unavailable to Citizens any administrative appeal, but at the same time—by enacting the ZSA without a public hearing—the City also deprived Citizens of public hearings mandated under both LUDMA (for legislative actions, including adoption of the ZSA), *see id.* §§ 10-9a-205(1)(a), 502(1)(b); *see also Call v. City of West Jordan*, 727 P.2d 180, 183 (Utah 1986) (stating that, "[i]n requiring a public hearing" before a municipal legislative body, "our legislature contemplated that interested parties would have an opportunity to give their views, pro and con, regarding a specific legislative proposal, and thereby aid the municipal government in making its land use decisions"), and the Moab Municipal Code (for consideration of

---

(…continued)

enacted. We disagree. The City overlooks the fact that Citizens argued, in the alternative, that the City had engaged in unlawful contract zoning, and that the City was not free to enter into a contract to avoid the application of its ordinances. It is of course true that, absent an exception, an appellate court will not consider an issue unless it has been preserved. *Patterson v. Patterson*, 2011 UT 68, ¶ 12, 266 P.3d 828. "An issue is preserved for appeal when it has been presented to the district court in such a way that the court has an opportunity to rule on it." *Id.* (quotation simplified). While "we view *issues* narrowly, . . . new *arguments*, when brought under a properly preserved issue or theory, do not require an exception to preservation." *State v. Johnson*, 2017 UT 76, ¶ 14 n.2, 416 P.3d 443. In our view, Citizens raised the broader contract zoning legal theory before the district court, even though they did not support that theory with as many arguments and citations as they do on appeal. We therefore do not believe that Citizens are faced with a preservation problem, especially in light of the City's agreement that passage of the ZSA was a legislative act, and therefore proceed to evaluate Citizens' arguments on their merits.

Developer's changes, which the City had concluded were major), *see* Moab, Utah, Mun. Code §§ 17.65.080(A), 17.65.130(B) (2015).

¶27 And LUDMA did require a public hearing prior to adoption of the ZSA. A "public hearing" is required prior to adoption of any "land use ordinance," *see* Utah Code Ann. §§ 10-9a-205(1)(a), 10-9a-502(1)(b), and a "land use ordinance" is defined as a "planning, zoning, development, or subdivision ordinance of the municipality," *id.* § 10-9a-103(25). The City approved the ZSA by adopting "Resolution #14-2017," and under the terms of the ZSA itself, the City was required—despite the language of the existing municipal code—to deem as minor certain changes that it had already determined to be major. Citizens persuasively argue that the resolution adopting the ZSA therefore effectively modified (or, stated another way, created a case-specific exception to) municipal land use ordinances, and that therefore Resolution #14-2017 was a land use ordinance for which a public hearing was required prior to enactment.

¶28 Given that a public hearing was therefore required (by statute) prior to passage of the resolution adopting the ZSA, and will be required (by ordinance, given the City's determination that the proposed changes were major) prior to approval of Developer's proposed changes, the City was not in a position—despite its relatively broad power to enter into contracts—to enter into a contract that would allow it to circumvent those public hearing requirements.[9]

---

9. In response to Citizens' argument that the City did not have the authority to circumvent statute or ordinance by way of contract, the district court took a broad view of the City's power to contract, determining that it could review the City's contracting decisions only for "collusion" or "bad faith." The court apparently drew this standard from Utah case law arising

(continued…)

¶29 The City certainly has the power to enter into and adopt contracts like the ZSA, and nothing in this opinion should be construed to the contrary. *See Dacy*, 845 P.2d at 797–98 (noting that not all contract zoning is illegal, and that a municipality can enter into contracts that do not "commit [the municipality] to any specified action before the zoning hearing," and do not "circumvent statutory procedures or compromise the rights of affected persons"). But it must hold a public hearing before it does so, and must allow members of the public, including Citizens, to be heard on the matter. The City (backed by SITLA and Developer) maintains that the terms of the ZSA are advantageous to the City, and that its adoption is in the best interest of the City and its citizens. We express no opinion on this question, but simply note that, if the ZSA is truly in the best interest of the residents of Moab, the City and Developer theoretically should be able to persuade the Council to approve it, even after a public hearing.

¶30 Moreover, the City has the power to approve Developer's proposed changes, but given its determination that the changes at issue are major, any such approval may occur only following a public hearing before the City's planning commission. Alternatively, the City has the power to reverse its previous determination that the changes are major, but doing so in

---

(…continued)
in the public procurement context. *See, e.g.*, *Cal Wadsworth Constr. v. City of St. George*, 898 P.2d 1372, 1375 (Utah 1995) (stating that, in the procurement context, "courts will not interfere with [municipalities'] judgment unless fraud, dishonesty, collusion, or lack of good faith is involved"). To our knowledge, this standard has never been applied in the contract zoning context, and in our view was inappropriately applied here by the district court.

isolation will trigger administrative appeal rights on the part of Citizens or others who disagree with the reversal.

¶31    While the City unquestionably has the power to pursue any of these options, one thing it cannot do is bury an otherwise administrative decision in a broader legislative contract, and then approve that contract by resolution without first holding a public hearing. The City's power to contract, while broad, does not extend that far.

CONCLUSION

¶32    We therefore reverse the district court's entry of summary judgment, and remand this case for further proceedings consistent with this opinion.

_____